

BALTIMORE | PHILADELPHIA | WILMINGTON | VIRGINIA

Ari Karen, Esquire
Direct Dial: 301-575-0340
E-Mail: akaren@offitkurman.com

May 18, 2012

<u>*Via Email* (ForrestNYSDChambers@nysd.uscourts.gov)</u>
Honorable Justice Katherine B. Forrest
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

   Re: **Morano, et al. v. Intercontinental Capital Group, Inc., et al.**
      **Case No. 10 CV 2192 (KBF)(JCF)**

Dear Justice Forrest:

  I am writing in response to the Order issued by this Court requesting that I make a submission outlining the differences between Mr. Tuzzo's declaration and his deposition testimony. Before highlighting the specific inconsistencies, and in order to help establish critical background facts, attached hereto is an affidavit from Defendant Kola Lulgjuraj, in which he explains how he was anonymously referred to a "neutral" attorney, who does not appear to have any experience in labor or employment law, but yet was familiar with this case and informed Mr. Lulgjuraj that he could get Mr. Lulgjuraj out of the lawsuit without costs exceeding a $1,000.00 retainer. Importantly, during his initial meeting with this "neutral attorney," Mr. Lulgjuraj reviewed his deposition testimony in detail, examining places/areas where his testimony could change. When Mr. Lulgjuraj began questioning the lawyer about the representations and how he would get out of the lawsuit for $1,000.00, the lawyer abruptly told Mr. Lulgjuraj that he was not going to represent him as there was insufficient trust.

  What is also notable is the exact temporal proximity between this meeting and the timing of certain communications between myself and Mr. Tuzzo. Also troubling is the substance of certain communications between myself and Mr. Tuzzo in terms of the nature and substance of requests made to me during this exact time period, and the timing of his decision to switch counsel. Of course, without opposing counsel's consent to non-waiver of the privilege, I am not at liberty to divulge these matters to the Court at this time. I can only represent that if the Court understood the timing and specific nature of the conversations of which the Court is not aware, it would be disturbing in light of the information provided by Mr. Lulgjuraj. Against this background, which appears to share too many coincidences for it to be mere happenstance, set forth below are many of the critical disparities between Mr. Tuzzo's declaration and his deposition testimony. While there are numerous specific examples contained herein, there is also a general concern that a reading of Mr. Tuzzo's declaration creates an inference of ICG loan officers working overtime, despite the fact that Mr. Tuzzo has already explicitly testified with respect to the hours worked by ICG's loan officers and the lack of overtime. In more detail:



BALTIMORE | PHILADELPHIA | WILMINGTON | VIRGINIA

Honorable Justice Katherine B. Forrest
May 18, 2012
Page 2

1. **"[T]here were always some loan officers working prior to 9:00 a.m. and after 6:00 p.m. during the week."** (Tuzzo Dec. ¶ 18)
   - *"I don't do payroll, but it was a known thing that people would leave at exactly 6:00. Some people would come in at 10:00 and leave at 6:00. Some people come in at 9:00 and leave at 6:00." Deposition of Robert Tuzzo, at 75:10 - 14 (hereinafter, citation by page/line only).*
   - *"Q. Was ICG open for business at 9:00 in the morning?
     A. Yeah, I would say. I mean it was dead. No one really came to work until 10:30." 85:3-6.*
   - *"I would say, from 5:00 to like 7:00, 7:30. You know, it would be quiet time in the office where I can get my work done." 117:22 - 24.*
   - *"[T]he people in the city branch were out like a fire drill at 6:00. At 6:00 the place was empty. Maybe there was a couple of people there, if that . . . " 130:14 - 17.*
   - *"The hours of operation from me seeing people working was usually like 10:30 to 6:00." 131:23 - 132:2.*
   - *"You know, I got here at about 9:30. The place was empty. If there was one or two people there, that was a good day." 132:23 - 25.*

2. **"There were always some loan officers working on Saturdays."** (Tuzzo Dec. ¶ 18)
   - *"Q. They come in on Saturday for a couple of hours?
     A. Very rare occasion. Saturday was an empty thing." 87:14 - 17.*
   - *"You know, Saturdays are funny days because, you know, this is a very strenuous business. Some people need breaks. You know, if someone missed half the week and had to make a couple of calls and follow-up and didn't feel comfortable making the calls from home because they had kids, it's possible. It's not a dedicated thing." 134:11 - 18.*

3. **"There were always some loan officers working until between 8:00 p.m. and 9:00 p.m. during the week."** (Tuzzo Dec. ¶ 19)
   - *"If loan officers did work between 6:00 and 8:00 it was because they came in later. I don't think there was enough for them to do to be there all of that time and also if people did work later than me, people would leave either to get food or to go to the gym for two hours. People have stuff to do. People run their errands during the day." 80:5 - 11.*
   - *"I was gone at 7:00. So for me to say this person was there, this person was there, I don't know." 131:8 - 10.*

4. **"People (potential customers) would call after dinner in the evening hours. People would call on Saturdays and Sundays on their day off."** (Tuzzo Dec. ¶ 27)
   - *"Q. There were also calls that came in after 5:00; isn't that correct?
     A. Drips and drabs.
     Q. But they did come in?*


Attorneys At Law

Honorable Justice Katherine B. Forrest
May 18, 2012
Page 3

> A. *When I say few and far between, I'm talking about one or two, not many.*
> Q. *Isn't that the time when potential customers are home from work?*
> A. *That's the strange thing. Being that a banking institution's usual bank hours are, you know, early in the morning to 5:00, so people would respond during those hours."* 79:10-21.

- *"I know the way the mail calls come in. They start early at like 8:00, and then they die at like 5:00, 5:30."* 65:10 - 12.

**5. "I was regularly pressured by Dustin Dimisa to have the loan officers working early in the morning. I was regularly pressured by Dustin Dimisa to have the loan officers working in the evening hours up until 9:00 p.m. I was regularly pressured to have loan officers working on Saturdays and have Saturday coverage especially if mail was hitting." (Tuzzo Dec. ¶ 28)**

- *"I never told someone, hey, come in early in the morning and stay late, but I would say come in later and stay later. So, you know, if I ever sent an e-mail saying, hey, work between 6:00 an[d] 8:00, I'm sure you will see another e-mail that says come in later . . .*
> Q. *Any action that you took, did it come from above?*
> A. *Yeah."* 142:9 - 22.
- *"[Saturday work was] not a dedicated thing."* 134:11 - 18.

**6. "At 1285 Sixth Avenue, I recall there being some loan officers working as early as 8am in the morning and some as late as 9pm in the evening during the week." (Tuzzo Dec. ¶ 11)**

- *"Q. What hours did you work when you began there in December of 2008, and let's talk about through the year 2009?*
> A. *9:30 to 7:00 I would say. Sometimes I would come in at 10:00, 10:30 and leave at 7:00, 7:30."* 64:16 - 21.
- *"The loan officers, if they were there from 5:00 to like 7:00 when I left, they were following up on calls and things like that. There was no other marketing coming in. There was nothing else. If they had their job done or didn't have good calls for the day, they were out, they were out like a fire drill."* 65:13 - 19.

**7. "When I started at ICG, there were loan officers already employed by the company. These loan officers were paid on a commission only basis. They were not being paid a minimum wage and were not being paid a guaranteed salary."(Tuzzo Dec. ¶ 5)."Dustin Dimisa and Richard Steinberg were not paying loan officers either a minimum wage or a salary." (Tuzzo Dec. ¶ 7)**

- *"The loan officers there, I do remember when we started they were paid minimum wage."* 52:24 - 25.
- *"Q. How is it that you know Patrice and John were getting minimum wage back in December of 2008?*



Honorable Justice Katherine B. Forrest
May 18, 2012
Page 4

    *A. I just remember Dustin sating to me, hey, where are the sales, I have these minimum wage payments. I just remember him having a conversation with me." 56:19 - 57:12.*

**8. "The loan officers now (early to middle 2009) were all being paid the sum of $628.00 every two weeks. This amount was paid whether a loan officer worked thirty (30) hours a week or fifty (50) hours a week."** (Tuzzo Dec. ¶ 23)
- *"Q. You have never seen any payroll documents for any of the loan officers?
  A. Not my job.
  Q. You have never seen any earning's records indicating how much they were paid and how many hours they worked?
  A. They would never give me access to the system, ADP, in order to do that." 181:10 - 17.*

**9. "I asked Dustin to pay the loan officers that I brought with me a minimum wage because they could not afford to wait until loans closed to get paid."** (Tuzzo Dec. ¶ 7)
- *"Q. Did you ever speak to Dustin about giving minimum wage to the loan officers?
  A. Not that I remember. When I first got there, like I said, we discussed what the people could get paid. He asked me what they were getting paid now and I told him. It was a salary plus commissions and he paid, I guess, minimum wage and commissions, but only upon arrival. I never discussed it during any time unless someone was not producing. Rob, what's going on with this guy, all we do is write minimum wage checks, he is not producing." 177:24 - 178:11.*

**10. "Jason Morano and AvinSamtani were paid on a commission only basis."** (Tuzzo Dec. ¶ 8)
- *"Q. JasonMorano was paid on commission only, correct?
  A. He got minimum wage and commission." 48:18 - 20.*
- *"Q. AvinSamtani, do you know if he was paid on a commission only basis?
  A. I don't know." 50:10 - 12.*

**11. "We worked at the 1285 Sixth Avenue location from December, 2008 until sometime in or around April or May, 2009. During this time, I do not believe that ICG maintained records recording the hours that the loan officers worked."** (Tuzzo Dec. ¶ 10). **"For a short period of time at East 59th Street, ICG still did not keep records which recorded the time that its loan officers worked . . ."** (Tuzzo Dec. ¶ 16)
- *"Q. In December of 2008 when you were at 1285 Avenue of the Americas, you said there were no time records being kept for the loan officers; is that correct?
  A. You know, it was weird because I had my head down working in one suite with two processors which are people who do the duties of working through these loans. Dustin really handled the payroll and the employees, what they would do and all that stuff. I tried not to get involved in that stuff.*

**Offit | Kurman**
Attorneys At Law

Honorable Justice Katherine B. Forrest
May 18, 2012
Page 5

> Q. Are you aware of whether or not there were time records --
> A. I'm not aware." 55:11 - 24.

- "Q. You are not aware back in December of 2008 whether the company kept time records which recorded the time of the loan officers?
  A. It wasn't in my job responsibilities. I wouldn't know." 56:6 - 10
- "Q. Do you know if in January, February, March of 2009, was ICG maintaining time records for its loan officers?
  A. As far as I can remember, I remember Kola collecting time records or sheets. I didn't really get involved in that, nor did I want to." 75:23 - 74:4.
- "Q. Do you know if time records were kept for the loan officers during the months of April and May of 2009?
  A. As far as I can remember, Kola always collected time records." 77:12 - 16.

**12. "I observed Dustin Dimisa and Richard Steinberg state on more than one occasion that ICG does not pay overtime to loan officers and that any overtime for the loan officers would have had to be approved by them and that the loan officers get paid based on a forty (40) hour work week."** (Tuzzo Dec. ¶ 33)

- "Q. Were you ever privy to any meetings with Dustin and Craig and maybe Richard where the time sheets were discussed?
  A. No. That was like a Kola thing. I don't like to be involved in that stuff.
  Q. Were you ever involved in any meetings with Dustin or Richard or Crain where payroll was discussed and the manner in which the loan officers were being paid was discussed?
  A. . . . . I really wasn't involved in payroll and everything else." 167:8 - 168:4.

Lastly, I would like to advise this Court that given the possible ethical implications, ICG has been forced to retain new counsel in this matter. ICG is in the process of searching for and retaining new counsel, who they expect to hire within the next week. Although I expect and hope I will not need to withdraw from this case in its entirety, I will not be able to make that determination until we are aware of certain rulings on matters that are pending or will shortly be pending before this Honorable Court. I thank the Court for its patience, and its attention to this important matter.

Respectfully submitted,

Ari Karen

Enclosure
cc:  Neil H. Greenberg (via email)
     Justin Reilly (via email)
     Amanda Fugazy (via email)

## AFFIDAVIT OF KOLA LULGJURAJ

My name is Kola Lulgjuraj, and I am over the age of 18 and competent to testify as to the matters set forth herein.

1. I am an employee of InterContinental Capital Group ("ICG") and, along with ICG, I am a defendant in <u>Morano, et al. v. Intercontinental Capital Group, Inc., et al.</u>, Case No. 10 CV 2192 (KBF)(JCF), In the United States District Court for the Southern District of New York ("the Lawsuit").

2. I make this declaration based on my personal knowledge and I am competent to testify on the matters contained in this Affidavit.

3. While discovery was pending in the Lawsuit, attorneys representing Plaintiffs took my deposition.

4. Several months later, in late February 2012, I was left an anonymous note on my desk at ICG with a phone number and the word, "Attorney."

5. I subsequently called the phone number that I had been provided and reached an attorney named Paul Israelson.

6. I informed Mr. Israelson that I was calling with regard to the Lawsuit and provided him with some background information.

7. Mr. Israelson invited me to his office for a consultation and instructed me to bring the materials that I had in my possession related to the Lawsuit; this included my deposition transcript, case materials, and email correspondence I had with my attorneys.

8. I accepted Mr. Israelson's invitation for a consultation since I was attempting to better understand all of my options with respect to the Lawsuit. I met with him on March 6, 2012.

1

9. When I met with Mr. Israelson he told me that he was "vaguely familiar" with the Lawsuit and he made a photocopy of my deposition transcript, which I had brought with me. Mr. Israelson asked me a number of questions as to the decision-makers regarding hiring and pay practices and asked specific questions as to how the timesheets were made, who created them and the procedures for collecting the timesheets. Mr. Israelson also told me that I may need to testify in the case and confirmed that I was willing to do that if necessary.

10. During the course of our meeting, Mr. Israelson asked me to go through the transcript with him and to point out to him any inaccuracies in my testimony or points that I felt were unclear and needed clarification. I did as requested and Mr. Israelson highlighted his copy of my deposition transcript accordingly.

11. Mr. Israelson also made several inquiries into the role of Dustin DiMisa and Richard Steinberg in the performance of ICG's human resources functions, such as hiring, termination, and payroll.

12. Inasmuch as I was aware of an upcoming settlement conference in the Lawsuit, I asked Mr. Israelson if he believed the case would be settled. He informed me that he has known Plaintiffs' counsel in the Lawsuit for many years, that this Lawsuit was important to Plaintiffs' counsel, and that he did not believe that Plaintiffs would be willing to take much of a discount to settle the Lawsuit.

13. Near the end of our meeting, Mr. Israelson indicated that he would need a retainer in the amount of $1,000.00 to represent me and that he was very confident that he could resolve the Lawsuit for me within the retainer amount of $1,000.00.

14. At that point, Mr. Israelson had me sign an engagement letter with his firm, a copy of which was not provided to me, and instructed me to pay the retainer in the next few days.

15. During the course of this lengthy meeting, Mr. Israelson excused himself about four times to take other phone calls.

16. A day or two after this meeting, I corresponded with Mr. Israelson via email. At that time, I indicated concern about the potential for additional costs related to the Lawsuit and any potential ancillary action. Mr. Israelson responded by stating that it was evident that I lacked faith in him and that, as a result, he would not be representing me and that no attorney-client relationship existed.

17. I have not spoken with Mr. Israelson since the aforementioned email exchange and Mr. Israelson has not returned to me the highlighted copy of my deposition transcript nor any of the emails I provided him between my current counsel and me.

I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

_____
Kola Lulgjuraj

**ACKNOWLEDGMENT**

I HEREBY CERTIFY, that on this _18_ day of May 2012, before me, the undersigned Notary Public of the State of New York, personally appeared Kola Lulgjuraj, known to me (or satisfactorily proven) to be the person whose name is subscribed above, and declared and acknowledged under oath, subject to the penalties of perjury, that the matters and facts set forth herein are true, accurate and complete to the best of his knowledge, information and belief.

IN WITNESS MY Hand and Notarial Seal.

_____
NOTARY PUBLIC

My Commission Expires:
_04/04/13_

EVYAN WOLFMAN
Notary Public, State of New York
No. 01WO6125074
Qualified in New York County
Commission Expires April 4, 20_13_

3